H. R. HANOVER AND SELMA HANOVER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hanover v. Commissioner
Docket Nos. 4648-77, 4651-77, 4652-77, 4761-77, 4813-77.
United States Tax Court
T.C. Memo 1979-332; 1979 Tax Ct. Memo LEXIS 190; 38 T.C.M. (CCH) 1281; T.C.M. (RIA) 79332; August 23, 1979, Filed *190 Petitioners' partnership owned the Hotel King Cotton in downtown Memphis, Tenn. The hotel, which had been built in 1927, did not meet the current building code requirements but was permitted to continue operating as a hotel under a "grandfather clause." In 1972 the property was leased to the U.S. Government for use as a Job Corps Training Center. In January 1973 the Government terminated the lease without having made any of the improvements anticipated. Since it was estimated that it would cost $640,000 to refurbish and improve the building to meet the building code requirements for a hotel, and it would have cost at least $100,000 to demolish the building, the partnership decided to abandon the building. It was locked and boarded up, a barricade was was put around it to protect pedestrians from falling debris, utilities were cut off, insurance was terminated, maintenance was discontinued, and no efforts were made to lease or sell the building itself. The partnership retained title to the land. Held, petitioners' partnership was entitled to an abandonment loss deduction on the building in 1973 and petitioners were entitled to deduct their distributive shares of the loss. *191 Tommy H. Jagendorf, for the petitioners. Wesley J. Lynes, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined the following *192 deficiencies in petitioners. 1973 Federal income taxes: Docket
No.
Petitioner
Deficiency
4648-77
H. R. Hanover and
Selma Hanover
$31,922.77
4651-77
I. E. Hanover
and Ruth Hanover
28,517.94
4652-77
Estate of A. E. Hanover,
Deceased, and Dena Hanover
28,317.72
4761-77
Philip Belz and
Sarah Belz
49,644.20
4813-77
Jack A. Belz and
Marilyn Belz
54,687.52
Due to concessions by both petitioners and respondent, [2] the only issue for decision is whether improvements to land, known as the Hotel King Cotton in Memphis, Tenn., were abandoned in 1973 such that petitioners are entitled to an abandonment loss deduction pursuant to section 165(a), I.R.C. 1954. [3]
FINDINGS OF FACT Some of the facts have been stipulated and *193 are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners H. R. Hanover and Selma Hanover is docket No. 4648-77, husband and wife, petitioners I. E. Hanover and Ruth Hanover in docket No. 4651-77, husband and wife, petitioners Philip Belz and Sarah Belz in docket No. 4761-77, husband and wife, and petitioners Jack A. Belz and Marilyn Belz in docket No. 4813-77, husband and wife, are all individuals who resided in Memphis, Tenn., when they filed their petitions in this case. Each husband and wife filed a joint Federal income tax return for the taxable year 1973 with the Director, Memphis Service Center, Memphis, Tenn. Petitioners Estate of A. E. Hanover, Decesed, and Dena Hanover, docket No. 4652-77, are an estate and an individual. When the petition in this case was filed, Dena Hanover resided in, and the Estate of A. E. Hanover had a mailing address in, Memphis, Tenn. A. E. Hanover and Dena Hanover, husband and wife, filed a joint Federal income tax return for the taxable year 1973 with the Director, Memphis Service Center, Memphis, Tenn. [4]
*194 A. E., I. E., and H. R. Hanover, partners, Southern Products Co. (hereinafter Southern Products), is a partnership that has been in existence since November 1, 1937, and was, during the year in issue, composed of petitioner H. R. Hanover, petitioner I. E. Hanover, and A. E. Hanover, the estate of whom is a petitioner. Southern Products has its principal place of business in Memphis, Tenn., and it filed its partnership return for the taxable year 1973 with the Director, Memphis Service Center, Memphis, Tenn. Belz Investment Company (hereinafter Belz Investment), is a partnership that has been in existence since November 1, 1964, and is, and was during the taxable year in issue, composed of petitioner Philip Belz and petitioner Jack A. Belz. Belz Investment has its principal place of business in Memphis, Tenn., and it filed its partnership return for the taxable year 1973 with the Director, Memphis Service Center, Memphis, Tenn. Belz Investment Co., a partnership, and Hanover Brothers (hereinafter Belz-Hanover), is a partnership that has been in existence since June 1, 1965, and is, and was during the taxable year in issue, composed of Southern Products and Belz Investment *195 as partners. Belz-Hanover has its principal place of business in Memphis, Tenn., and it filed its partnership return for the taxable year 1973 with the Director, Memphis Service Center, Memphis, Tenn. On June 1, 1965, Belz-Hanover purchased the Hotel King Cotton (hereinafter HKC), located in downtown Memphis, Tenn. This hotel was constructed in 1927 and 1928. The purchase price of the hotel was $313,165, of which Belz-Hanover allocated $90,000 to the land and $223,165 to the improvements. Over the years there have been additions made to the hotel so that, in 1973, the basis in the improvements to the land, as adjusted, amounted to $263,611.92. When acquired by Belz-Hanover, the HKC was an operating hotel, having transient guests, permanent-individual tenants, and commercial tenants. Belz-Hanover operated the HKC as a going concern until June 1972.
When acquired by Belz-Hanover, the HKC did not conform to all of the City of Memphis building code provisions which were then applicable to hotels. The HKC was allowed to continue hotel operations, however, under a "grandfather clause." Under this clause hotels constructed prior to the effective date of a particular code provision *196 were not required to comply with the provision if hotel operations were conducted on a continuous basis. The grandfather clause would cease to exempt a hotel building of hotel operations were discontinued. On April 19, 1972, Belz-Hanover and the United States Government entered into a lease agreement for the HKC. The Government intended to use the building as the "Memphis Job Corps Residential Training Center." Prior to entering into the lease, the Government prepared a Condition Survey of the HKC. The survey indicated that $600,000 in improvements to the HKC would be undertaken to prepare the hotel for use as a training center. These improvements would also have conformed the HKC to the applicable building code provisions.[5]
As required by the lease agreement, Belz-Hanover discontinued hotel operations in the HKC, terminated the leases of all permanent-individual tenants, removed all commercial tenants, and removed all furniture, draperies, restaurant equipment, and personal property from the hotel. *197 The property removed was valuable as part of a hotel business but it was virtually worthless after its removal. Belz-Hanover then transferred possession (in 1972) of the property to the Government in accordance with the lease agreement. After taking possession of the hotel, the Government did not undertake any improvements and did not use the building. On January 10, 1973, the United States Department of Labor advised Belz-Hanover by letter that the lease agreement was to be terminated. A Termination of Lease was executed by all parties on May 3, 1973. The effective date of the termination was April 16, 1973. The Government paid $221,713 to Belz-Hanover in full settlement for terminating the lease, which amount Belz-Hanover reported as income. [6]
In April 1973, Belz-Hanover requested that the assessed value of the property for county tax purposes be reduced because of: (1) The termination of the hotel operations in 1972; (2) the loss of the grandfather-clause exemption for the hotel; and (3) the Government's termination of the lease. Said value was reduced *198 from $200,000 to $66,000 for the years 1973, 1974, and 1975. [7] Although testimony was introduced that the new assessed value was based solely on the land, no definite evidence was introduced allocating this amount between the improvements and the land.
During the summer of 1973, Belz-Hanover became aware that it was not economically feasible to reopen the hotel. On August 31, 1973, petitioners I. E. Hanover and Jack A. Belz had a meeting at which Belz-Hanover made a "formal decision" to "abandon" the hotel building. A memorandum was prepared as a summary of the meeting in which this decision was made. This memorandum recites that expenditures of at least $500,000 would be necessary to reopen the hotel, including the repairs necessary to conform the building to the applicable city building code provisions. The memorandum further states: It was determined that [expending $500,000 to reopen the hotel] would be totally impractical for [Belz-Hanover] and that no such expenditures would be made, nor would [Belz-Hanover] try to negotiate any lease which *199 would involve [Belz-Hanover] making these tremendous expenditures for someone else. In effect, the building cannot now be used and is essentially abandoned as such, and instead of adding, represents an additional expense burden because of insurance, real estate taxes, security and protective repairs. There is some concern about certain exterior portions of the building needing masonry and roofing work. It was determined to obtain proposals for the cost of razing the building and leaving the land graded level. This would at least eliminate excess expenditures which produce no income, if reasonable proposals can be obtained. Having decided to "abandon" the HKC, Belz-Hanover took the following actions: (1) The building was locked and boarded; (2) a barricade was placed around the building to protect passers-by from falling masonry and stone; (3) utilities were terminated although a standby fee was paid to maintain the utility connections; (4) maintenance was discontinued; and (5) cost proposals for demolishing the building were solicited. The building was not demolished, however, because of the expense (approximately $100,000) involved. Additionally, petitioner Jack A. Belz *200 asked the insurance department of Belz-Hanover to have the insurance coverage terminated. In February 1974, petitioner Jack Belz discovered that insurance on the HKC was still in effect.This insurance, contained in 3 policies, in the total amount of $1,000,000 for fire and lightening, extended coverage, [8] vandalism and malicious mischief, and $92,500 for rental value, was cancelled retroactively to September 1, 1973. Premiums paid pursuant to these policies for periods subsequent to August 31, 1973, were refunded to Belz-Hanover. On 2 of the policies, premiums were paid subsequent to August 31, 1973.On the remaining policy, the last premium was paid on August 28, 1973. No insurance remained in effect for the HKC after the cancellation of the 3 policies. During early 1975 the HKC was systematically stripped by thieves of many of its fixtures, including lighting fixtures, metal plumbing fixtures, firehoze nozzles, and copper wiring and piping. Considerable damage was done to the building in the course of the theft. Estimated *201 replacement and repair costs were in excess of $100,000. This theft was reported to the police in mid-April when it was discovered and the police were asked to investigate. Belz-Hanover did not claim any tax loss for this theft. On April 23, 1975, Belz-Hanover purchased two 1-year term insurance policies in the amount of $50,000 each on the HKC. These policies provided fire insurance and extended coverage, plus insurance to pay demolition costs in the event local law required the demolition of the building. The yearly premium for each policy was $1,250. The purpose of the policy was to provide funds which could be used by Belz-Hanover to have the HKC demolished in the event of an insured loss. Accordingly, the total amount of insurance was based on what was estimated to be sufficient to pay for the demolition of the building.It was not in any way based on the building's value.These policies were cancelled by the insurance carrier on September 19, 1975. On the same date, Belz-Hanover purchased a 6-month insurance policy in the amount of $100,000 on the HKC.This policy provided fire and lightning insurance and extended coverage. Although requested to do so, the insurer refused *202 to include demolition coverage in the policy. The policy premium was $1,800. The policy coverage was later increased to $150,000 for an additional premium of $339. On March 16, 1976, the policy was extended for an additional 6 months in the adjusted amount of $150,000. The policy premium for the extended period was $3,000. The purpose of this policy was also to provide funds which could be used to have the HKC demolished in the event of an insured loss. On its partnership return of income for the year 1973, Belz-Hanover reported a loss on abandonment of property in the amount of $290,648.07. This figure was intended to represent the adjusted basis Belz-Hanover had in improvements known as the Hotel King Cotton. The parties now agree that on August 31, 1973, the adjusted basis in said improvements was no greater than $263,611.92. The claimed abandonment loss was reflected in the distributive shares of Belz-Hanover's net loss for the taxable year and in turn, in the distributive shares of Southern Products' net income and Belz-Investment's net loss for the taxable year and in turn, in the taxable incomes of petitioners for the taxable year. Respondent totally disallowed *203 the loss on the ground that the building had not been abandoned in 1973. The HKC has not been used since 1972 and it was still standing at the time of trial. Belz-Hanover at all times has been willing to sell the land on which the HKC was located, although it maintains that no "building" was for sale. ULTIMATE FINDING OF FACT Belz-Hanover did not hold the Hotel King Cotton building for sale subsequent to August 31, 1973, and it did abandon said hotel in 1973.
OPINION Whether a deductible loss has been sustained is a question of fact which must be determined by reference to all the surrounding facts and circumstances. Burke v. Commissioner, 32 T.C. 775 (1959), affd. 283 F.2d 487 (9th Cir. 1960). The respondent's determination that such a loss has not been sustained is presumed to be correct and petitioners have the burden of proving that determination wrong. Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111, 115 (1933). The narrow factual question to be determined in this case is whether petitioners *204 have sustained that burden by showing that improvements to land known as the Hotel King Cotton were abandoned in 1973 by Belz-Hanover.
Abandonment losses are allowable pursuant to the general statutory language of section 165(a). [9] Section 703(a) makes this provision applicable in computing the taxable income of partnerships. [10]Section 1.165-2(c), Income Tax Regs., refers to section 1.167(a)-8, Income Tax Regs., "[for] the allowance under section 165(a) of losses arising from the permanent withdrawal of depreciable property from use in the trade or business * * *." Section 1.167(a)-8(a), Income Tax Regs., provides that *205 "actual abandonment" is one method by which depreciable property can be permanently withdrawn from use in a trade or business. Section 1.167(a)-8(a)(4), Income Tax Regs., further provides: Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition.
Where a taxpayer owns the fee to land with improvements thereon, he may, if the improvements lose their useful value and are actually abandoned and written off as a loss, become entitled to a deduction for an abandonment loss for such improvements notwithstanding that he continues to retain title to the land on which the improvements are located. *206 Burke v. Commissioner, supra.
The intent to abandon must be established by an affirmative act. Burke v. Commissioner, supra; Ford v. United States, an unreported case ( W. D. Ky. 1967, 20 AFTR2d 5033, 67-2 USTC par. 9546), affd. per curiam 402 F. 2d 791 (6th Cir. 1968). Furthermore, a loss is not allowable merely for a shrinkage in value.Abandonment constitutes "the complete elimination of all value in an asset and the recognition by its owner that the asset no longer possesses any utility." Louisville & Nashville Railroad Co. v. Commissioner, 66 T.C. 962, 1007 (1976), on appeal (6th Cir. June 2, 1978). Thus, in order to establish an allowable loss, petitioners must prove (1) the intent to irrevocably discard the Hotel King Cotton so that it would be neither reused nor retrieved, (2) an affirmative act which establishes that intent, and (3) the disutility of the Hotel King Cotton, all in 1973. Respondent contends that petitioners have not abandoned the hotel because, subsequent to the date of *207 the claimed abandonment, petitioners: (1) Retained title to, and dominion over, both the building and the land; (2) held the land for sale, and it is not possible to sell the land without also selling the building; (3) paid standby fees to maintain utility connections; (4) reported the theft of the building fixtures and asked the police to investigate; (5) purchased fire and extended coverage insurance for the building; and (6) paid property taxes and made no showing that such amounts were paid solely for the land.These facts, according to respondent, merely evidence a decision by petitioners to discontinue use of the hotel building, not abandon it, because of the expense involved in reopening. Respondent's argument is well taken. Nonetheless, we believe that consideration of all the facts and circumstances leads to the conclusions that petitioners have sustained their requisite burden and shown that in 1973 the Hotel King Cotton no longer possessed any value, that Belz-Hanover recognized such fact, and that Belz-Hanover intended to and did abandon the hotel. The factual difficulty presented in this case is that petitioners are claiming a loss for the physical abandonment of a *208 multi-story hotel building while concurrently retaining the land upon which the building is located and holding that land for sale. For Federal income tax purposes, it is not impossible for a taxpayer to physically abandon improvements to land and claim a loss therefor, notwithstanding that the underlying land is retained. Burke v. Commissioner, supra.Demolition of the abandoned property is not required to justify the deduction. See Hummel v. United States, 227 F.Supp 30 (N.D. Cal. 1963); Minneapolis, St. Paul & Sault Ste. Marie Ry. Co. v. Commissioner, 34 B.T.A. 177, 185 (1936). Tanforan Co. v. United States, 313 F.Supp. 796 (N.D. Cal. 1970), affd. per curiam 462 F.2d 605 (9th Cir. 1972). [11] While it is clear that property has not been abandoned if it is held for sale, it is also recognized that a fortuitous sale of the land after termination of the use of the depreciable assets thereon does not change the result. Tanforan Co. v. United States, supra.Whether Belz-Hanover "carved-out" *209 the hotel building from the land and only retained the latter for sale, or whether Belz-Hanover retained both for sale is but another way of asking whether Belz-Hanover abandoned the HKC. When acquired by Belz-Hanover, the HKC did not conform to all of the applicable city building code provisions. The hotel was able to continue operations, however, under a "gradfather clause" which exempted buildings constructed prior to the effective date of the provisions and in which hotel operations (in HKC's case) were conducted on a continuous basis from application of the code provisions. HKC lost its exemption when hotel operations were discontinued and the premises leased to the Government. During lease negotiations, the Government indicated that $600,000 in improvements to the HKC would be undertaken to prepare the hotel for use as a training center. These improvements would also have conformed the HKC to the applicable building code provisions. When in 1973 the Government terminated the lease before making any improvements, Belz-Hanover was faced with the prospect of having to expend *210 at least $500,000 in order to reopen the hotel. This expenditure was necessitated in part by the need to replace the furniture and equipment which had been removed from the hotel prior to the delivery of the building to the Government and in part by the need to conform the building to the applicable code provisions. Petitioner Jack A. Belz testified at trial concerning the decision of Belz-Hanover not to reopen the HKC. At the time of trial he had been in the building construction and real estate development business for 30 years and he was engaged in the operation of a number of hotel properties in addition to the HKC. He testified that in the summer of 1973 he estimated it would require approximately $640,000 to reopen the hotel. He further testified that it was impossible to secure financing to reopen the hotel and that the only economically feasible course was to "abandon" the building. We found this testimony to be candid, forthright, and persuasive. Based thereon, we conclude that in 1973 the HKC did lose all its value to the owners as a hotel building. The remaining question is whether Belz-Hanover intended to irrevocably discard the HKC. Many of the facts which indicate *211 an intent to abandon are also affirmative acts of abandonment. At a meeting on August 31, 1973, Belz-Hanover made the "formal decision" to abandon that building. A memorandum was prepared as a summary of that meeting. This memorandum states that economic considerations require that the hotel be abandoned and that proposals for razing the building and leveling the land will be sought. Additionally, Belz-Hanover took the following actions: (1) The building was locked and boarded; (2) a barricade was placed around the building to protect passers-by from falling masonry and stone; (3) utilities were terminated; [12] and (4) insurance coverage was terminated. [13] Maintenance of the building was discontinued which, together with the absence of heat in the building, resulted in increased deterioration of the building. Additionally, it has been found as a matter of fact that the HKC was not held for sale and it would have been demolished but for the cost involved. *212 These affirmative acts lead the Court to the conclusion that the intent was formed to irrevocably discard the HKC so that it would neither be reused nor retrieved for other disposition. [14]Belz-Hanover's purchase of fire and lightening, and extended coverage insurance in 1974 does not persuade us that a different result should be reached. Initially it must be noted that events in a later tax year cannot be determinative of anphysical abandonment loss question in an earlier year. Coors Porcelain Co. v. Commissioner, 52 T.C. 682 (1969), affd. 429 F.2d 1 (10th Cir. 1970). [15] Secondly, weighing this fact with all of the others, we do not agree that it is inconsistent with an intent to abandon. Insuring the building was intended to provide funds to pay for demolition of the building if damage to the building resulted in Belz-Hanover being required to demolish it. *213 Accordingly, we conclude that Belz-Hanover permanently withdrew the Hotel King Cotton from use in 1973 by means of actual physical abandonment and that petitioners are entitled to a deduction pursuant to section 165(a) for the unrecovered cost basis of the Hotel King Cotton. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: I. E. Hanover and Ruth Hanover, docket No. 4651-77; Estate of A. E. Hanover, Deceased and Dena Hanover, docket No. 4652-77; Philip Belz and Sarah Belz, docket No. 4761-77; and Jack A. Belz and Marilyn Belz, docket No. 4813-77.↩
2. Petitioners claimed their pro rata share of $290,648.07 as an abandonment loss on their 1973 income tax returns.The parties agree that if petitioners are entitled to an abandonment loss deduction, the total amount deductible is $263,611.92. ↩
3. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue.↩
4. Petitioners Selma Hanover, Ruth Hanover, Dena Hanover, Sarah Belz, and Marilyn Belz are parties herein solely by reason of their filing of joint income tax returns for 1973 with their respective spouses.↩
5. The basic term of the lease was 2 years, subject to the lessee's right to terminate on 90 days' notice upon payment of the rent due for any remainder of the 2-year term.↩
6. This was apparently the rent that would have been payable over the remainder of the basic term of the lease.↩
7. For county property tax purposes, property in Shelby County, Tenn., was assessed at 40 percent of the appraised value.↩
8. Extended coverage provided insurance protection for damage caused by such occurrences as hail, tornados, windstorms, riots, and civil commotion.↩
9. Sec. 165(a) provides: There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
10. Sec. 703(a) provides in part: The taxable income of a partnership shall be computed in the same manner as in the case of an individual * * *.↩
11. See also Offshore Operations Trust v. Commissioner, T.C. Memo. 1973-212↩.
12. Belz-Hanover's payment of a standby fee to maintain utility connections is not necessarily inconsistent with a decision to abandon the building. Payment of such a fee is reasonable to protect the value of the land and insure that future users of the land have access to utilities. In any event, such fact must be weighed with all the other facts and circumstances. ↩
13. The fact that the insurance was cancelled in Feb. 1974 retroactively to Sept. 1, 1973, does not change the result.↩
14. In reaching this conclusion little reliance can be placed on the reduction of the assessed value of the property for county tax purposes. Specific evidence of the breakdown between land and improvements of the lower value was not introduced. Additionally, Belz-Hanover's request for a reduction in the assessed value of the property was made in April 1973, a date 4 months prior to the date of the formal decision to abandon the HKC. Even assuming that Belz-Hanover paid county property taxes for the HKC, this does not require a conclusion that the building was not abandoned for Federal income tax purposes. It is but one factor to be considered. ↩
15. See also Offshore Operations Trust v. Commissioner, supra↩.