KOLLSMAN INSTRUTMENT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kollsman Instrument Corp. v. Commissioner
Docket No. 9289-72.
United States Tax Court
T.C. Memo 1986-66; 1986 Tax Ct. Memo LEXIS 546; 51 T.C.M. (CCH) 463; T.C.M. (RIA) 86066; February 11, 1986. Paul A. Teschner, for the petitioner. Vikki Pryor, for the respondent. WRIGHT
MEMORANDUM OPINION WRIGHT, Judge*: Respondent determined an overassessment of $137,840 and a deficiency of $2,330,954 in petitioner's Federal income taxes for 1965 and 1966, respectively. After concessions by the parties, two issues remain for decision: (1) whether petitioner is entitled to a deduction of $4,359,000 on its 1966 return to reflect a loss from a long-term contract, income from which was reported in the taxable years 1963, 1964, and 1965 (the contract issue) and *547 (2) whether petitioner's expenditures of $868,000, $2,114,000, and $1,389,000 in 1966, 1967, and 1968, respectively, were properly deducted in those years as research and development costs pursuant to section 174 [1] (the research and development issue). [2]
The facts have beeen stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At all times relevant to this case, Kollsman Instrument Corporation (Kollsman or petitioner) was a New York corporation. From its incorporation until December 29, 1972, Kollsman was a wholly owned subsidiary of Standard Kollsman Industries, Inc. (SKI), an Illinois corporation. *548 On that date, SKI, pursuant to a plan of reorganization, merged into Sun Chemical Corporation (Sun), at which time Kollsman became the Kollsman Instrument Company Division of Sun. The Contract Issue
In November 1962, Kollsman and the Air Force entered into a contract (the letter contract) under which Kollsman agreed to furnish the services and materials necessary to conduct the engineering investigation and the fabrication of an airborne data collection subsystem and a ground data processing subsystem. The letter contract specified a maximum price of $6,728,986 and further specified $3,364,493 as the maximum amount for which the government would be obligated upon termination of that contract. The letter contract also contained the parties' agreement to execute a definitive fixed price contract in 1963. Such a contract (the negotiated contract) was signed by Kollsman on April 4, 1963, and was signed and approved by the Air Force in May 1963. The negotiated contract superseded the letter contract, although certain requirements of the letter contract were not changed. Under the negotiated contract Kollsman agreed to fabricate operational prototypes of a geodetic and photo *549 mapping system and a ground data processing subsystem. In March 1964 the Air Force awarded Kollsman a separate contract (the production contract) for the manufacture of that system. The negotiated contract contained the following "Changes" clause, standard in government contracts: 2. CHANGES The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specifically manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the work required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 60 days from the date of receipt by the Contractor *550 of the notification of change; * * * Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled "Disputes." However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed. In the course of performance of the negotiated contract, engineers from Kollsman and the Air Force jointly worked out agreements on many engineering, design, specification, and production changes. Pursuant to the Changes clause, the Air Force periodically incorporated such changes in formal Contract Change Notifications (CCNs). CCNs were issued with respect to the negotiated contract on June 21, 1963, on November 29, 1963, and on May 26, 1964. Each subsequent CCN superseded and canceled the prior one. The CCNs did not necessarily precede the implementation of the changes. In some instances the changes were not yet accomplished; in others, they were ongoing; and, in still others, they had been completed prior to the issuance of the CCN by the contracting officer. Although each CCN stated the Air Force's unilateral view of the effect on its appropriated funds of the estimated increase *551 or decrease in price resulting from the CCN, such statements were for administrative purposes only and did not affect the rights of either party to negotiate an equitable adjustment pursuant to the Changes clause. The CCNs did not reflect any agreements between the Air Force and Kollsman with respect to the impact of the requested changes upon petitioner's costs, the delivery schedule of the program, or the contract price. For the years 1963, 1964, and 1965, the costs records of Kollsman's Systems Management Division were separately maintained for the negotiated contract and for the production contract, but such records did not separately identify costs incurred with respect to changes made pursuant to CCNs. There are no books and records available from which such distinction or separate identification could be made. At the end of the respective years 1963, 1964, and 1965, Kollsman was unable to estimate or quantify the extent to which costs had been incurred under the negotiated contract and, consequently, at those times it could not estimate or quantify the total costs expected to be incurred for CCN changes. The negotiated contract contained the standard "Disputes" clause, *552 which provided, in part, that any factual disputes (i.e., cost of a change) arising under such contract which could not be disposed of by agreement between the parties could be submitted by Kollsman to a contracting officer, whose resolution of the question would be final unless reversed by the Secretary of Defense or, subsequently, by a court of competent jurisdiction upon timely appeal. On December 30, 1964, Kollsman submitted to the Air Force a Request for Equitable Adjustment of the price and delivery schedules for the negotiated contract. Kollsman claimed $5,146,137 as its additional cost on the negotiated contract and $395,157 profit, for a total claim of $5,541,294. On June 30, 1965, it revised that document to reflect subsequent changes and claimed $5,134,088 as its additional cost and $394,177 profit, for a total of $5,528.205. Despite numerous meetings during 1965, representatives of Kollsman and the Air Force were unable to reach a consensus and finally agreed to disagree on the merits of Kollsman's claim. On January 10, 1966, the Air Force contracting officer issued his final decision which denied, in part, Kollsman's request for an equitable adjustment, and determined *553 that Kollsman was entitled only to an additional $123,780 with respect to the changes under the negotiated contract. A supplemental agreement to that contract with an effective date of November 17, 1966, authorizing an increase in price of $123,780 was approved by Kollsman on March 9, 1967, and by the Air Force on March 10, 1967. On September 22, 1966, Kollsman filed with the Armed Services Board of Contract Appeals an appeal from the contracting officer's January 10, 1966, decision on its equitable adjustment claim. That appeal was superseded by an amended complaint filed April 14, 1967. A supplemental agreement and modification of the negotiated contract with an effective date of June 15, 1967, authorizing an increase in price of $1,876,220 was approved by the Air Force on September 26, 1967. This amount plus the $123,780 previously awarded (a total of $2,000,000) was awarded by the Air Force in full settlement of Kollsman's claim for equitable adjustment and appeal thereon and such award effectively settled the complaint filed before the Armed Services Board of Contract Appeals. At all relevant times Kollsman kept its books and records and, in general, reported its income *554 and expenses for tax purposes using the accrual method of accounting. Kollsman used the cost percentage of completion method to account for the contracts here in question. On its 1966 return, Kollsman claimed a deduction of $4,359,000 which represented its adjustment for an overreporting of sales income in 1963, 1964, and 1965 with respect to the government contracts. On its 1967 return, Kollsman claimed a deduction of $3,318,000 with respect to the negotiated contract and the production contract. The parties agree that at least $2,359,000 of the 1967 amount is attributable to the negotiated contract and is a duplication of the $4,359,000 deduction in 1966 less the $2,000,000 final settlement award on that contract. The Research and Development Issue
During 1966, 1967, and 1968, Kollsman incurred various expenses with respect to other contracts to which it was a party, including the following: the KS-200 Contract, by which Kollsman agreed to produce for the Boeing Company (Boeing) the Boeing 737 Air Data Computer; a contract by which Kollsman agreed to provide the Air Force with AAU-19 Altimeters; the Boeing 4289 and 4292 Contracts, under which Kollsman agreed to provide *555 Boeing with Altimeters for the 747 Aircraft; and the Matie AAU-21A Project Contract, by which Kollsman agreed to produce the AAU-21A Altimeter for the Department of the Navy. On its Federal income tax returns for 1966, 1967, and 1968, Kollsman claimed deductions of $868,000, $2,114,000, and $1,389,000, respectively, for alleged research and development costs incurred in the performance of the above contracts. All expenses other than the claimed research and development costs were amortized over a three-year period. Insofar as is relevant here, in his notice of deficiency for 1966, respondent disallowed petitioner's deduction of $4,359,000 for overaccrued income from the long-term contract and also disallowed petitioner's deduction of $868,000 for claimed research and development costs. Respondent capitalized the latter amount over three years, thereby allowing a deduction of $289,000 (868,000 / 3) in 1966. Deductions in 1967 and 1968 for claimed research and development expenses were also capitalized by respondent.These deductions resulted in net operating losses, which were carried back and used in computing the refund due petitioner based on the overassessment for 1965. *556 Legal Discussion
The first issue for decision is whether petitioner is entitled to a deduction on its 1966 Federal income tax return to reflect a loss from a long-term contract, income from which was reported, using the percentage of completion method of accounting, in the taxable years 1963, 1964, and 1965. The regulations allow taxpayers to report income from long-term contracts under the percentage of completion method, the completed contract method, or any other method that clearly reflects income. Sec. 1.451-3(a), Income Tax Regs. Petitioner in the instant case reported the income from its contracts with the Air Force under the percentage of completion method. That method provides that the portion of the gross contract price which corresponds to the percentage of the entire contract which has been completed during the taxable year must be included in gross income for such taxable year. Sec. 1.451-3(c)(1), Income Tax Regs. The determination of the percentage of completion of a contract may be made by comparing, as of the end of the taxable year, (1) the costs incurred with respect to the contract with the estimated total contract costs or (2) the work performed on the *557 contract with the estimated total work to be performed. The taxpayer has broad discretion in computing income or loss under the percentage of completion method because the regulations permit any method of cost comparison so long as it is consistently applied and clearly reflects income. Sec. 1.451-3(c)(2), Income Tax Regs. The regulations provide, in general, that "where an amount of income is properly accrued on the basis of a reasonable estimate and the exact amount is subsequently determined, the difference, if any, shall be taken into account for the taxable year in which such determination is made." Sec. 1.451-1(a), Income Tax Regs.
Respondent does not contend, with respect to 1963, 1964, and 1965, that petitioner's accrual of income under the percentage of completion method was improper or that its estimates were unreasonable. Instead, respondent argues, inter alia, that the deduction here at issue was improper because the amount of that deduction did not become certain until 1967 and, thus, could not properly be taken before that time. For the following reasons we agree with respondent. On January 10, 1966, the Air Force contracting officer made a determination that Kollsman *558 was entitled to only $123,780 as a result of its equitable adjustment claim. On September 22, 1966, Kollsman appealed that determination to the Armed Services Board of Contract Appeals. That appeal was superseded by an amended complaint filed April 14, 1967. Petitioner's appeal was not resolved until September 26, 1967, by the execution of a modification contract which allowed the equitable adjustment claim in the amount of $2,000,000, including the $123,780 already allowed. These facts establish that at the close of its 1966 taxable year, an appeal was pending on petitioner's claim for equitable adjustment. During the pendency of the appeal petitioner was unable to determine the exact amount which it would receive under the government contracts, and, therefore, it could not determine the difference between the amount of income already accrued and the exact amount of income it would receive. See sec. 1.451-1(a), Income Tax Regs. Thus, in 1966 petitioner had no basis upon which to claim a loss and, in any event, had no means of calculating the amount of any such loss. Accordingly, we sustain respondent's determination that the deduction taken on the 1966 return was improper. *559 The second issue for decision is whether petitioner is entitled to a deduction under section 174 for claimed research and development expenditures. As a preliminary matter, we note that deductions are a matter of legislative grace; the taxpayer must satisfy the specific statutory requirements of the deductions claimed to reduce his tax liability. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Respondent's determinations are presumptive correct and petitioner bears the burden of proving its entitlement to any deduction. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Section 174(a) provides that a deduction shall be allowed for research and experimental expenditures which are paid or incurred during the taxable year in connection with the taxpayer's trade or business. The term "research or experimental expenditures" is defined in the regulations as "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant *560 process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned." Section 1.174-2(a), Income Tax Regs. In considering the above definition, this Court found it to be "consistent with the intent of the statute to limit deductions to those expenditures of an investigative nature expended in developing the concept of a model or product." Mayrath v. Commissioner,41 T.C. 582, 590 (1964) (emphasis in original), affd. without discussion on this issue 357 F.2d 209 (5th Cir. 1966). Respondent maintains, generally, that petitioner's claimed research and development costs are not deductible in the year in which they were incurred but must be amortized over three years. He concedes that petitioner incurred expenses in the amounts claimed and that such expenses were connected with petitioner's trade or business, but he contends that the expenditures at issue are not research and experimental expenditures within the meaning of section 174. Petitioner argues, however, that its contracts specifically provide that Kollsman perform duties of a research and experimental nature. In attempting *561 to establish entitlement to deductions under section 174, petitioner quotes extensively from the contracts under which the alleged research and experimental duties were performed. By selectively quoting from such contracts, petitioner apparently is attempting to highlight those segments which, when read alone, could be interpreted as requiring Kollsman to perform design activities, produce prototypes, and engage in pre-operation testing. Repetition here of the quoted material would serve no purpose. It is sufficient to say that after careful review of the submitted documents, we conclude that the contracts here in question did not require Kollsman to invent or to develop the concept of or to design any product. Rather, such contracts can fairly be characterized as production contracts under which Kollsman agreed to manufacture or produce certain equipment in accordance with designs furnished to it. Because we find that these are production contracts, which did not require petitioner to perform duties of an experimental nature, petitioner's expenditures are not deductible as research and experimental expenditures, within the meaning of the statute. By way of illustration, several *562 of the contracts in question were entered into after Kollsman's submission of a proposal pursuant to invitations to do so by the various buyers. Such invitations set forth specifications and requested that cost proposals be prepared for the production of certain items in accordance therewith. In several instances, these proposals were to be submitted for the indicated incremental quantities which, in the case of the AAU-19 contract, ranged from 1,201 to 1,576. Price schedules for several of the contracts sometimes varied as the required quantity changed. Several of the proposals and resultant contracts set forth production and/or delivery schedules for the items produced. For example, with respect to the KS-200 Contract, Boeing provided Kollsman with "Boeing 737 Air Data Computer Specification 10-61229" and invited Kollsman to submit a cost proposal which contemplated production and delivery of the first complete configuration by February 1, 1966, and further provided for production and delivery of one shipset in August 1966, two shipsets per month from September 1966 through September 1967, and between five and nine shipsets per month thereafter. After submitting its proposal, *563 Kollsman and Boeing entered into a general terms agreement applicable to the purchase and sale of the "Kollsman Air Data Computer KS-200 as set forth in Detail Specification No. 10-61229." Based on our review of the entire record in this case including the foregoing, we find that petitioner has failed to prove that it incurred research and experimental expenditures within the meaning of the statute. Moreover, even if we were to assume that research and experimental expenditures were incurred with respect to petitioner's contract with Boeing, it is impossible to determine, on the basis of the evidence submitted, what portion, if any, of the claimed research and experimental expenditures was properly classified. The amount claimed by petitioner is not broken down in any way to indicate the nature and amount of the expenses which constitute the deductions of $868,000, $2,114,000, and $1,389,000 in 1966, 1967, and 1968, respectively. We are not persuaded by petitioner's bare assertion that expenditures in these amounts were attributable to research and experimental costs with respect to various contracts. Nor is the fact that petitioner deducted certain expenses and capitalized others *564 conclusive as to the character of the deducted expenditures or the propriety of such deductions. Petitioner bears the burden of proof in this matter. Welch v. Helvering,supra.We find that petitioner has failed to prove either its entitlement to or the amount of its deductions under section 174. See generally Coors Porcelain Co. v. Commissioner,52 T.C. 682, 697-698 (1969), affd. 429 F.2d 1 (10th Cir. 1970). Petitioner maintains that respondent has introduced no evidence challenging either the accuracy of petitioner's books and records or the attestations, signed by petitioner's officers as part of its tax return, that such returns were correct. Petitioner argues, therefore, that the presumption of correctness usually accorded respondent's determination should not be applied here, citing Weimerskirch v. Commissioner,596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). In Weimerskirch, the Commissioner determined a deficiency based upon the taxpayer's failure to report income he allegedly received from selling heroin. The Court of Appeals for the Ninth Circuit, expressly addressing only *565 the facts of that particular case, held that the Commissioner was not entitled to rely on the presumption of correctness unless he offered some substantive evidence linking the taxpayer to the sale of narcotics or showing that the taxpayer received income from the charged activity. Weimerskirch v. Commissioner,supra at 361-362. The facts of that case are, however, fundamentally distinguishable as there is no allegation in the instant case of unreported income from any source, legal or illegal. Petitioner's reliance on Weimerskirch is misplaced. Cf. Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982), affg. 73 T.C. 1163 (1980). Accordingly, we will apply the general rule under which the Commissioner's determination is presumptively correct and petitioner bears the burden of proving otherwise. See generally Dellacroce v. Commissioner,83 T.C. 269 (1984) and cases cited therein. Based on the foregoing, petitioner has failed to meet this burden. Finally, petitioner contends that it should be relieved of the obligation to meet its burden of proof and argues that it should not be penalized for its failure *566 to produce sufficient evidence because such failure is attributable to the unavailability of Kollsman employees with knowledge of the subject at issue, due to the long period during which this case remained pending. Petitioner also urges that, at the least, this Court should apply the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), to treat a portion of Kollsman's expenses as research and experimental expenditures. We are not persuaded by either of petitioner's arguments. That petitioner bears the burden of proof in this case is in accordance with the Rules of this Court and with case law. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). We may not dispense with such precedent in order to relieve the burden imposed upon petitioner under the law, nor would we be inclined to do so where, as here, petitioner's difficulty is of its own making. Although the petition in this case was filed in December 1972, the issues in this case were not submitted to this Court for consideration until some 11 years later because of the numerous continuances granted upon petitioner's requests. We do not find, nor do we suggest, that petitioner has unnecessarily *567 delayed this case. [3] Nevertheless, on this record, we find no basis upon which to suspend or adjust the rules of this Court. We must also decline petitioner's request that we apply the Cohan rule to find at least a portion of its expenses deductible under section 174. First, petitioner has failed to establish to our satisfaction that any of its expenses were of the type that could properly be deducted under that section. Furthermore, on the record before us petitioner has presented nothing upon which we could make the approximation permitted by Cohan.
To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155.
Footnotes
*. By order of the Chief Judge this case was reassigned from Judge Darrell D. Wiles to Judge Lawrence A. Wright↩ for disposition. 1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Alleged research and development costs which were deducted in 1967 and 1968 are at issue here by virtue of their effect on the net operating loss carryback adjustment for 1965.↩
3. The long period of time between the filing of the petition and the submission of this case is due, primarily, to the pendency in the Court of Claims of a suit involving the same issue as this case. See Sun Chemical Corp. v. United States,698 F.2d 1203 (Fed. Cir. 1983), affg. an unreported decision of the United States Claims Court, cert. denied 464 U.S. 819↩ (1983).